**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Charles WHALEN,**
**Defendant–Appellant.**

**No. 90–2031.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 13, 1990.
Decided Aug. 14, 1991.

For the following reasons, we affirm the judgment of the district court.

## I

## BACKGROUND

Inmates Calvin Otts and Mr. Whalen shared cell A–5 at the Federal Correctional Institution at Oxford, Wisconsin (FCI–Oxford). Otts and Mr. Whalen became cellmates by mutual consent more than two months before the incident at issue here after Mr. Whalen's former cellmate was removed for disciplinary segregation. On the morning of July 3, 1989, Otts put a note in Mr. Whalen's shirt pocket; the note referred to the possibility of sexual relations between Mr. Whalen and Otts at some unspecified time. Mr. Whalen confronted Otts about the note that afternoon and asked whether Otts was a homosexual. Otts denied that he was a homosexual, apologized to Mr. Whalen, and agreed to move to another cell. Ostensibly, Otts' indiscretion was forgiven: Mr. Whalen, Otts, and inmate Marvin Brown, a friend of Mr. Whalen, drank homemade alcohol together in cell A–5 that evening.

At approximately 10:35 p.m., Correctional Officer Gary Manthey began his routine check of the cells near A–5. The door to A–5 was closed, but Manthey saw through the cell window that Otts was sitting in a chair in the middle of the cell. No other person was in the cell with Otts at that time. Manthey returned to his office after completing his rounds. About fifteen minutes later, Manthey was approached by Mr. Whalen, who said "open up [cell] A–5 real quick." R. 122 at 60–61. Manthey entered the cell and found Otts slumped in a chair with his throat slashed; Manthey immediately cleared other inmates away from the area and summoned assistance. Correctional Officer Forrest Farmer was the first to respond to Manthey's alarm signal.

After Otts was removed from the cell, Mr. Whalen stood near the officer's station while Manthey sketched notes on the incident. When Farmer approached the officer's station, Mr. Whalen accused Farmer of killing Otts. Farmer and Manthey then

Daniel P. Bach, Asst. U.S. Atty. (argued), Madison, Wis., for plaintiff-appellee.

Mark F. Borns (argued), Borns, Macaulay & Jacobson, Madison, Wis., for defendant-appellant.

Before CUDAHY, EASTERBROOK and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Charles Whalen, an inmate in a federal correctional facility, slashed the throat of a fellow inmate on July 3, 1989. On February 22, 1990, a jury convicted Mr. Whalen of assault with intent to commit murder. Mr. Whalen now appeals, raising a host of challenges to his trial and his sentence.

restrained Mr. Whalen and had him placed in segregation.

Otts was flown by helicopter to the University of Wisconsin Hospital in Madison. His attending physician, Dr. Jacobson, found numerous slash wounds on both sides of Otts' neck. A wound on the right side of Otts' neck was over one-half inch deep and had cut his jugular vein. All of the wounds were straight, clean cuts and were the result of multiple strokes. Otts was returned to the prison a few days after the incident and wrote notes on the episode for the FBI. These notes contained conflicting versions of the assault—Otts stated in one version that he had cut his own throat; he stated in another that Mr. Whalen was responsible for the cuts.

On October 26, 1989, while in segregation, Mr. Whalen gave two letters to an officer to be mailed. The letters were unsealed. Both letters contained admissions by Mr. Whalen that he had cut a man's throat. The day before Mr. Whalen wrote these two letters, he asked to speak to his case manager, Robert Thalacker. Before Thalacker arrived at Mr. Whalen's cell, Mr. Whalen told Correctional Officer Jon Street that he had cut Otts' throat and that he would "do it right" if given another chance. Tr. II at 12–14. Mr. Whalen later made the same statement to Thalacker, in the presence of Street.

On November 15, 1989, Mr. Whalen was indicted for assault with intent to kill Otts. The jury trial began on February 20, 1990. At the trial, Otts testified that he was drunk on the night of July 3 and fell asleep in the bottom bunk of his cell at approximately 9:15 p.m. He stated that he woke up sometime later and saw Mr. Whalen kneeling next to him. He then felt something warm on his chest. Otts testified that he felt he needed air; he tried to get out of his cell. Mr. Whalen shoved him back into the cell. Otts said that Mr. Whalen struck him on the neck and shoulder as Otts struggled to get out of the cell. According to Otts, Mr. Whalen ran out of the room while Otts passed out.

The government also called inmate Ronald Carthins, whose cell is across the hall from A–5, to testify. Otts visited Carthins' cell after Otts had finished drinking with Mr. Whalen. After a brief discussion, Carthins helped the intoxicated Otts back to his cell and into bed. Later that evening, he heard a loud noise emanate from Otts' cell. When Carthins looked through the window of Otts' cell, Carthins saw Mr. Whalen cutting Otts' throat.

Mr. Whalen also testified at trial. He admitted that he had cut Otts' throat, but asserted that he had done so in self-defense. Mr. Whalen indicated that he was carrying a razor on the night of July 3 because he was afraid of a group of inmates from Washington, D.C., Otts' hometown. He testified that he went to his cell to straighten things out with Otts. When he walked into the cell, Otts rushed at him and tried to grab him. After he pushed Otts back, Mr. Whalen stated that Otts reached under the pillow on the top bunk and again came at him, although Mr. Whalen testified that he did not see a weapon in Otts' hands. Mr. Whalen then began "slashing wildly with the razor." Tr. II at 54.

The jury found Mr. Whalen guilty of assault with intent to commit murder. The district court determined that Mr. Whalen's offense level was 31, which included a two level increase for obstruction of justice because the court found that Mr. Whalen had given false testimony. The district court sentenced Mr. Whalen to 144 months' imprisonment followed by five years of supervised release.

## II

## ANALYSIS

Mr. Whalen raises challenges to his conviction and to his sentence. We shall provide additional facts when necessary to address Mr. Whalen's arguments.

### A. *Comment upon Mr. Whalen's Silence*

The day after the assault on Otts, FBI agents advised Mr. Whalen of his constitutional rights in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Mr. Whalen elected to

exercise his right to remain silent. Approximately four months later, however, Mr. Whalen told Correctional Officers Street and Thalacker that "I cut that f_____'s throat. If I would have done it right I would have killed him." R. 123. Mr. Whalen took the initiative in making these statements. The correctional officers did not question him. At trial, the government asked Mr. Whalen why he had not mentioned cutting Otts' throat in self-defense. After an objection was raised to this line of questioning, the court permitted the government to question Mr. Whalen about those statements that he made to the two correctional officers but prohibited the government from asking any questions about post-arrest silence. Mem. op. at 3. At closing argument, the government made the following remarks:

> There are the other statements that he made after the assault to Bob Thalacker and John Street. What were those statements? "I'd do it again if I got the chance." Is that consistent with a claim of self-defense, "I'd do it again if I got another chance"? "I'd cut that f_____'s throat," that's what he said.
>
> A person who has to defend himself under perilous circumstances goes out and tells people about it. He says, "I cut the guy's throat, but he was coming after me. I did what I had to do under the circumstances to save myself." Is there one witness you heard testify that that's what Otts [sic] said? None of the witnesses—or that's what the Defendant said. None of those witnesses to whom the Defendant made post-assault statements stated that the Defendant said anything of that sort.

Tr. of Plaintiff's Closing Argument at 30–31.

Mr. Whalen argues that the government improperly commented upon his post-arrest silence in violation of *Miranda v. Arizona* and *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). In *Doyle*, the Supreme Court held that the impeachment use of a defendant's silence following his arrest and receipt of *Miranda* warnings violated his rights under the due process clause. The Court reasoned that post-arrest silence is "insolubly ambiguous" in light of *Miranda*'s admonition that a criminal suspect is not required to make any statement. 426 U.S. at 617, 96 S.Ct. at 2244. Silence "may be nothing more than the arrestee's exercise" of his constitutional rights. *Id.*

■ Here, however, Mr. Whalen did not remain silent. For whatever reason, Mr. Whalen decided to speak to Correctional Officers Street and Thalacker about the incident with Otts. The Supreme Court has noted that "a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Anderson v. Charles*, 447 U.S. 404, 408, 100 S.Ct. 2180, 2182, 65 L.Ed.2d 222 (1980); *see also Phelps v. Duckworth*, 772 F.2d 1410–13 (7th Cir.) (en banc), *cert. denied*, 474 U.S. 1011, 106 S.Ct. 541, 88 L.Ed.2d 471 (1985). Given the facts of this case, Mr. Whalen's statements were inconsistent with his claim at trial that he cut Otts' throat in self-defense. The government merely used Mr. Whalen's statements (and logical conclusions that could be drawn from these statements) to highlight weaknesses in Mr. Whalen's self-defense theory; the government attempted to draw no inference from Mr. Whalen's invocation of his right to silence. Thus, the government's questioning and closing remarks did not violate the strictures of *Doyle*. *See Anderson*, 447 U.S. at 408, 100 S.Ct. at 2182; *Grancorvitz v. Franklin*, 890 F.2d 34 (7th Cir.1989) (no *Doyle* violation when government comments upon post-arrest failure to complain of injuries allegedly suffered), *cert. denied*, —— U.S. ——, 110 S.Ct. 2566, 109 L.Ed.2d 749 (1990).

### B. *Jury Instructions*

■ Mr. Whalen contends that the trial court erred when it refused to instruct the jury that a person could have a reasonable belief that he needed to use force even though his belief later turned out to be

false.[1] When considering a challenge to jury instructions, the instructions as a whole must be evaluated. *United States v. Grier*, 866 F.2d 908, 932 (7th Cir.1989). " 'As long as the instructions treat the issues fairly and adequately, they will not be interfered with on appeal.' " *United States v. Machi*, 811 F.2d 991, 1005 (7th Cir.1987) (quoting *United States v. Patrick*, 542 F.2d 381, 389 (7th Cir.1976)); *see also Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.*, 924 F.2d 633, 638 (7th Cir.1991).

The district court instructed the jury that it must determine what Mr. Whalen reasonably believed under the circumstances. We believe that the court committed no error by refusing to give Mr. Whalen's proffered instruction, which simply reframed the relevant inquiry—to evaluate Mr. Whalen's belief at the time of the incident without considering the events that actually occurred. The jury instructions given by the court fairly and adequately appraised the jury of the law; we require no more.[2]

### C. *Evidentiary Challenges*

■ Our review of the district court's evidentiary rulings is limited to whether the court abused its discretion. *See Unit-* ed *States v. Rodriguez*, 925 F.2d 1049, 1053 (7th Cir.1991). Mr. Whalen carries a "heavy burden in challenging the trial court's evidentiary rulings because a reviewing court gives special deference to the evidentiary rulings of the trial court." *United States v. Briscoe*, 896 F.2d 1476, 1489–90 (7th Cir.) (citation omitted), *cert. denied*, —— U.S. ——, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990). "Appellants who challenge evidentiary rulings of the district court are like rich men who wish to enter the Kingdom; their prospects compare with those of camels who wish to pass through the eye of a needle." *United States v. Glecier*, 923 F.2d 496, 503 (7th Cir.1991). Moreover, an erroneous evidentiary ruling is harmless unless it had a substantial influence on the result of the trial. *See United States v. Hill*, 898 F.2d 72, 76 (7th Cir.1990); *United States v. Pirovolos*, 844 F.2d 415, 425 (7th Cir.), *cert. denied*, 488 U.S. 857, 109 S.Ct. 147, 102 L.Ed.2d 119 (1988).

### 1. Expert witnesses

#### a.

■ Mr. Whalen called two expert witnesses to testify at trial. After background questions were asked of each wit-

---

**1.** The district court gave the following self-defense instruction:

> A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself (or another) against imminent use of unlawful force.
> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent death or great bodily harm to himself (or another).

*Federal Criminal Jury Instructions of the Seventh Circuit*, § 4.01.

The court also gave an instruction submitted by Mr. Whalen:

> If the defendant had reasonable grounds to believe that he was in imminent danger of death or serious bodily harm and that deadly force was necessary to repel such danger, he was not required to retreat or to consider whether he could safely retreat. He was entitled to stand his ground and use such force as he reasonably believed was necessary under the circumstances to save his life or to protect himself from serious bodily harm.

**2.** The court also gave the following instruction: "However, if the Defendant could have safely retreated but did not do so, his failure to retreat is a circumstance which you may consider together with all other circumstances in determining whether he went farther in repelling the danger, real or apparent, than he was justified in doing under the circumstances." Mr. Whalen argues that the court should not have given this instruction because a prison cell is an inmate's home, thus obviating the need for retreat and providing the absolute right to use force to defend himself in his home.

The instruction given by the district court stated that Mr. Whalen was not required to retreat if he reasonably believed that his life was threatened. The jury also was advised that they could consider the possibility of retreat when evaluating the reasonableness of Mr. Whalen's response to the perceived threat. As such, the instruction was a correct statement of the law. *See United States v. Loman*, 551 F.2d 164, 168 (7th Cir.) (failure to retreat is factor for jury to consider in determining whether defendant went farther than justified under circumstances), *cert. denied*, 433 U.S. 912, 97 S.Ct. 2982, 53 L.Ed.2d 1097 (1977).

ness, it became apparent that Dr. Daniel Eisnagle was to testify about the HIV (AIDS) virus in an attempt to bolster Mr. Whalen's claim that he feared contracting the AIDS virus from Otts, who had contracted the AIDS virus, and thus to explain Mr. Whalen's letters (indicating that he wished Otts had died); Dr. Jean Warrior was to testify about the physiological and psychological reactions of people who face extreme fear in an attempt to explain why Mr. Whalen may not have seen a weapon in Otts' hand even if he was holding one. The district court excluded the testimony of these witnesses. Mr. Whalen contends that the exclusion of this testimony denied him a fair trial.

The admissibility of expert testimony is governed primarily by Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The district court found that the testimony of neither expert was relevant to any fact in issue. "The decision to admit expert testimony is committed to the discretion of the trial court and its determination will be affirmed unless it is 'manifestly erroneous.'" *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir.1990) (quoting *Bob Willow Motors, Inc. v. General Motors*, 872 F.2d 788, 797 (7th Cir.1989)).

The court's decision to exclude the testimony of these two experts was well within its sound discretion. Dr. Eisnagle's testimony concerning the transmission of the AIDS virus simply was not relevant to the case and could well have distracted the jury's attention from those issues that were relevant. Dr. Warrior's testimony related to the general reaction to fear, not Mr. Whalen's particular state of mind. The district court was entitled to conclude that the jury did not require the insight of those possessing specialized knowledge in

order to understand an individual's reaction to fear.

### b.

 Mr. Whalen also argues that the trial court should have admitted certain testimony of Frank Hernandez. Two witnesses (Officer Manthey and inmate Carthins) testified that they could see Otts sitting in the chair in his cell by looking through the window in the cell door. Hernandez now resides in cell A–5, the cell in which Otts was assaulted. At the time of the crime, he did not live in cell A–5, nor did he witness any part of the assault. Rather, he lived in cell A–18 on the same hall and had some view of cell A–5. Hernandez testified that the layout of the bunk, cabinets, and desk were the same as on the night of the assault. Mr. Whalen argues that the district court erroneously prevented him from asking Frank Hernandez a hypothetical question about whether it would have been possible to see Otts by looking through the window in the door. Mr. Whalen made an offer of proof that Hernandez would have testified that a pair of pants hanging from a bunk would have blocked the view into the back of the cell.

Whether Hernandez' testimony was offered as that of a layperson (as it clearly was at trial) or as an expert (as it is now argued to us and, viewed charitably, was at trial), we cannot say that the district court's decision not to admit the testimony was an abuse of discretion. First, Hernandez affirmatively testified that he never looked into the cell from the vantage point of the two witnesses who testified they saw Otts in the chair. Because Hernandez had not looked through the window into Otts' cell on the night of the assault, he had no personal knowledge of the condition of the cell that night. Second, it was hardly an abuse of discretion for the district court to conclude that Hernandez was not qualified "by knowledge, skill, experience, training or education" to "assist the trier of fact to understand the evidence or to determine a fact in issue" by answering hypothetical questions about a physical arrangement he never actually witnessed. Of course, his present occupancy of cell

A–5, Otts' former cell, does not, standing alone, give Hernandez any expertise on how that cell can be seen from areas outside the cell.

In any event, it is indeed a tenuous proposition that Mr. Whalen would have been acquitted had the district court permitted Hernandez to testify about visibility into the cell. Mr. Whalen conceded that he cut Otts' throat—the only question was whether he acted in self-defense. When the testimony of Otts is combined with Mr. Whalen's two letters (indicating that he had cut a man's throat) and Mr. Whalen's statements to Officers Street and Thalacker (that he would "do it right" if given another chance), Hernandez' testimony hardly would have caused the jury to acquit Mr. Whalen. Indeed, on the issue of visibility of the cell's interior, the jury may not have discounted Carthins' testimony even if Hernandez had testified on this issue.

### 2. Otts' prior conduct

■ Mr. Whalen also contends that the district court improperly excluded evidence of Otts' prior aggressive and homosexual behavior. This evidence consisted of a note written by Otts suggesting sexual activity (not the note placed in Mr. Whalen's shirt pocket), the testimony of inmates who had received sexual overtures from Otts, and a prison report about a fight involving Otts. Prior to trial, the court ruled that specific acts of aggressive or homosexual behavior were not admissible unless Mr. Whalen demonstrated that he had knowledge of these acts at the time of the incident in the cell. The court reasoned that only specific acts of which Mr. Whalen was aware at the time of the assault were relevant to his state of mind and, thus, his claim of self-defense.

Mr. Whalen asserts that, under Federal Rule of Evidence 404(b), he should have been permitted to introduce the note written by Otts, as well as Otts' prior overtures to other inmates to show Otts' intent, preparation, or plan to engage in sexual conduct with Mr. Whalen. Nothing about the note suggests that Otts intended, planned, or prepared to sexually assault Mr. Whalen. Rather, the note at most indicates Otts' interest in consensual sex with Mr. Whalen. Similarly, the affidavit detailing Otts' prior sexual advances toward other inmates contained no assertion that Otts had either threatened to assault, or actually did assault, anyone. The trial court thus did not abuse its discretion by excluding this evidence.[3]

■ Mr. Whalen also suggests that the prison report of Otts' fight with another inmate was admissible under Federal Rule of Evidence 404(b). This evidence is a classic example of prior act evidence to show a propensity for violence. Indeed, Mr. Whalen has not demonstrated that Otts' previous fight was in any way relevant to the slashing incident except to show Otts' propensity for violence.[4] Accordingly, the evidence was not admissible under Rule 404(b).

### 3. Mr. Whalen's mail

Mr. Whalen argues that the district court should have granted his motion to suppress the two letters containing admissions that he had cut a man's throat. Mr. Whalen contends that the letters were opened in violation of his first and fourth amendment rights. The district court determined that inmates have no legitimate expectation of privacy with regard to their mail and that prison officials do not violate inmates' rights by examining their letters. Mr.

---

**3.** We also note that, despite the court's ruling, much of the evidence made its way into the trial. One inmate testified that Otts had solicited sex from him on a number of occasions. Another inmate testified that most of the inmates in the cell block in which Otts and Mr. Whalen were housed were homosexuals. Finally, a third inmate testified that Otts had referred to Mr. Whalen as "his girl." Thus, we have no doubt that any prejudice to Mr. Whalen from

these rulings, even if erroneous, would be insufficient to warrant a new trial.

**4.** Because the government called witnesses to testify about Otts' peaceful reputation, evidence of Otts' fights could have been an appropriate subject on cross-examination of the government's character witnesses under Federal Rule of Evidence 404(a). However, at trial, Mr. Whalen did not pursue admissibility on this basis.

Whalen suggests that a prison must notify a prisoner that his outgoing mail will be read for a prisoner to have no legitimate expectation of privacy worthy of protection under *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The government contends that the line of precedent beginning with *Stroud v. United States,* 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919), precludes acceptance of Mr. Whalen's argument. In *Stroud,* the Supreme Court held that interception by prison officials, and subsequent use in prosecution, of letters written by an inmate did not violate the prisoner's fourth amendment rights. Modern cases have limited *Stroud* to situations in which prison officials have seized outgoing letters in the exercise of legitimate government interests. *See United States v. Brown,* 878 F.2d 222, 225 (8th Cir.1989); *Meadows v. Hopkins,* 713 F.2d 206, 208–11 (6th Cir.1983). Thus, *Stroud* "still controls cases in which such seizures are prompted by reasonable justification." *Brown,* 878 F.2d at 225.

■ "[B]ecause of their reasonable concern for prison security and inmates' diminished expectations of privacy, prison officials do not violate the constitution when they read inmates' outgoing letters." *Id.; see also United States v. Kelton,* 791 F.2d 101, 102–03 (8th Cir.), *cert. denied,* 479 U.S. 989, 107 S.Ct. 583, 93 L.Ed.2d 586 (1986). FCI–Oxford officials are permitted to examine inmates' outgoing mail to ensure that the mail does not interfere with the orderly running of the prison, contains no threats, and does not facilitate criminal activity. *See* 28 C.F.R. § 540.14(b). In short, it is well established that prisons have sound reasons for reading the outgoing mail of their inmates.

■ The record affirmatively shows that the prison requires inmates to leave their letters unsealed and that Mr. Whalen had left unsealed the two letters at issue in this case. It is therefore clear that he had no expectation of privacy with respect to their contents. Because Mr. Whalen demonstrated an expectation that his mail was being inspected, we have no difficulty agreeing with the district court's refusal to suppress Mr. Whalen's letters.[5]

**4. Miscellaneous challenges**

■ Mr. Whalen makes two final arguments: that the district court improperly admitted evidence of his prior bad acts and that the district court should have permitted inmate Craig Davis to state that he was afraid to testify because of a gang of inmates from Washington, D.C. (Otts' hometown). These arguments have no merit. Mr. Whalen testified on direct examination about the conditions he had encountered while in the segregation unit at FCI–Oxford. Mr. Whalen's apparent strategy was to demonstrate that segregation affected his mindset and caused him to write the two letters stating that he had cut a man's throat. On cross-examination, the court permitted the government to ask whether Mr. Whalen was familiar with the conditions associated with segregation. The government did not delve into the conduct responsible for landing Mr. Whalen in segregation, but rather highlighted that Mr. Whalen was indeed a veteran at dealing with the stress of segregation. As for the refusal to allow inmate Davis' testimony, we have reviewed the record and concluded that this decision was within the sound discretion of the trial court.

**D. *Obstruction of Justice***

■ The district court imposed a two-level increase in Mr. Whalen's base offense level for obstruction of justice under U.S.S.G. § 3C1.1. False testimony concerning a material fact constitutes obstruction under section 3C1.1. *See id.* Application Note 1(c). The sentencing court's determination that a defendant obstructed justice is a finding of fact. We review such decisions under a clearly erroneous standard. *United States v. White,* 903 F.2d 457, 460 (7th Cir.1990). In this case, the district court's decision was not clearly

---

**5.** This court already has squarely rejected Mr. Whalen's argument that inspecting a prisoner's mail for contraband violates his first amend-

ment rights. *See Martin v. Tyson,* 845 F.2d 1451, 1456–57 (7th Cir.), *cert. denied,* 488 U.S. 863, 109 S.Ct. 162, 102 L.Ed.2d 133 (1988).

erroneous. The district court found that Mr. Whalen's testimony was totally inconsistent with the physical and testimonial evidence adduced at trial. The court noted many such inconsistencies, including: that the clean, straight nature of the cuts was inconsistent with wounds caused by wild slashing; that the statements made to Thalacker and Street were inconsistent with Mr. Whalen's testimony that he was in fear for his own well-being during his slashing of Otts; and that the absence of any blood on Mr. Whalen was inconsistent with his claim that an altercation occurred.

## Conclusion

For the reasons stated above, the judgment of the district court is affirmed.

AFFIRMED