975 A.2d 862

**Robert Lee McFARLIN**

v.

**STATE of Maryland.**

**No. 119, Sept. Term, 2008.**

Court of Appeals of Maryland.

July 17, 2009.

Bradford C. Peabody, Asst. Public Defender (Nancy S. Forster, Public Defender, Baltimore), on brief, for petitioner.

Robert Taylor, Jr., Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen., Baltimore), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, BARBERA and ADKINS, JJ.

GREENE, Judge.

In this case we must determine whether a letter that Petitioner, Robert Lee McFarlin, wrote to his father from prison was wrongfully admitted into evidence at McFarlin's trial for murder. To reach this determination, we must address whether the Maryland Correctional Adjustment Center ("MCAC") seized the letter in violation of the Fourth Amendment of the United States Constitution. We shall hold that McFarlin's constitutional rights were not violated and that his letter was properly admitted into evidence.

## I.

On February 3, 2004, McFarlin was serving a prison sentence at the Maryland House of Correction Annex ("MHCA"),[1] for convictions unrelated to this appeal. On that date, McFarlin stabbed and killed fellow MHCA inmate, Damon Bowie. Because McFarlin killed Bowie, he was transferred from MHCA to MCAC, a "maximum level II" facility in Baltimore. According to the Maryland Institute of Correction's 2007 Handbook,[2] a "maximum level II facility," is a facility of "the highest security level for problem males who have shown a pattern of violence or institutional misconduct, or are very high escape risks."

Shortly after Bowie's death, investigators sought and received a "mail cover"[3] for McFarlin, which directed mail room clerks at MCAC to photocopy McFarlin's outgoing mail. The mail cover request was marked with an expiration date of March 4, 2004. On April 13, 2004, McFarlin wrote a letter to his father that stated: "I done put myself in a deep hole, Pop. I killed someone in prison. I can't explain it." McFarlin placed his letter in an unsealed envelope pursuant to a MCAC rule and dropped the letter in the area designated for outgoing mail.[4] MCAC officials intercepted the letter, photocopied it, and provided a copy to State prosecutors. The State sought to introduce the letter into evidence at McFarlin's trial for murder. McFarlin moved to suppress the letter and a suppression hearing took place on February 3, 2005.

---

1. The Maryland House of Corrections Annex has since been renamed the Jessup Correctional Institution.

2. The Maryland Division of Correction 2007 Inmate Handbook is available online at http://d pscs.maryland.gov/rehabservs/doc/pdfs/2007—Inmate—Handbook.pdf (last visited Jun. 22, 2009).

3. A "mail cover" is a screening device requested by a law enforcement agency and implemented by the prison.

4. We provide further explanation of the MCAC rule regarding outgoing mail *infra*. The record indicates that the place designated for outgoing mail was a lockbox.

At the suppression hearing, various State employees testified about MCAC's policies and regulations relating to inmate correspondence. The record reflects the following:[5]

James Peguese ("Warden Peguese"), warden of the Annex and a former correctional officer at MCAC, was the first to testify. He stated that as of March 2000, all new inmates at MCAC received an inmate orientation manual and listened to an audio tape advising them of MCAC's policies regarding incoming and outgoing mail. Warden Peguese also stated that there was a Division of Corrections Directive in place at MCAC, which "advises MCAC would not handle the mail as all of the other institutions do." He described MCAC's regulations regarding outgoing mail as follows:

[Warden Peguese]: All correspondence being sent out of the institution by inmates was to be left unsealed for inspection prior to being sent out of the facility.

[State]: And when you say "for inspection," what does that mean?

[Warden Peguese]: Well, we check for a variety of things. We check for contraband leaving the institution. We also check for content . . . keeping in mind that these were the people that had been moved from other populations that were disruptive or created some disturbances or were violent in another population-we wanted to check to see whether or not there was correspondence going back and forth to one of the other institutions that might indicate that something was about to happen, or them giving directions to someone that something was about to happen.

We checked for, as I mentioned, contraband, because in many instances they tried to make-they sent various items to political figures [sic] to the President. We also checked to make sure that no one was trying to make

---

5. The testimony appears as presented by the Court of Special Appeals in its unreported opinion in this case, *McFarlin v. State*, No. 2129, September Term 2006, 181 Md.App. 743. Internal footnotes have been admitted.

contact with a victim, because we found that happened in several cases. So it was a variety of things there.

With regard to [McFarlin], Warden Peguese stated his specific concerns as follows:

[Warden Peguese]: Well, yes. I wanted to determine whether or not there could be a possible retaliation; determine whether [Bowie's death] was gang-affiliated or whether there was going to be other players involved . . .

[State]: And would monitoring [McFarlin's] outgoing mail provide information that would satisfy any of those concerns?

[Warden Peguese]: It definitely could.

In addition, Warden Peguese stated that, "because of the type of inmate that was received at MCAC, [there] was reasonable cause to inspect all mail."

The next person to testify at the suppression hearing was Sergeant Donald Lane ("Sgt. Lane") of the Department of Public Safety, Internal Investigative Unit. He stated that on February 4, 2004, his unit requested a "mail cover" on [McFarlin]. Sgt. Lane described the procedure as follows:

[Sgt. Lane]: A mail cover is what we use as an investigative tool. Once we identify a suspect-or in a crime; [sic] not just homicides, but big assaults and other crimes-we place what we call a mail cover. What we do is we have a form and we fill it out and we present that to the Commissioner of Corrections. He has to approve it or disapprove it. And then the mail cover request, what we do is we-just a brief narrative of what the situation is, what the crime is, and why we want the mail cover.

We forward that to the Commissioner of Corrections. He approves it or disapproves it. When he approves it, we forward it to the institution that the inmate is being housed at. And then what they do is they collect the mail, incoming and outgoing, photocopy it, and then pass it forward on to us, and we review it to see if there is any evidence or any mention of the crimes or [sic] the list, not

only the suspect, but other possible people that may be involved as well.

[State]: Okay. And when you say they forward it on to you, "they" being the personnel in the Mail Department?

[Sgt. Lane]: The personnel in the Mail Department, and there is usually an investigator at each institution, especially the larger institutions with maximum security inmates and medium security inmates. They have their own institutional investigators, which are actually correctional officers. And that's who we use, we pretty much deal with.

And then the mailroom personnel are actually the ones that do the mail covers. They're the ones that open the mail, copy it, and they put it into a file, and then either they fax it down to us, or we go and pick it up, or the investigative officer at the institution will contact us.

In this case, the "investigative officer" in MCAC was Lieutenant Kim Wilson ("Lt. Wilson"). Sgt. Lane further stated that "pursuant to . . . internal policy," he forwarded the mail cover request to the Commissioner of Corrections and it was subsequently approved. He stated:

[Sgt. Lane]: When I do a mail cover on cases I'm working on, I don't put an end date, I put a start date. And then what I'll do is I'll contact the institution where the inmate is residing when I am finished, or when I have what I needed from the mail cover, and just verbally, you know, tell him to stop it, or ask him to stop the mail cover at that time.

[State]: Okay. So when you personally institute a request for [sic] mail cover, it is your practice to not put an end date on it. You notify the institution when you want it to stop.

[Sgt. Lane]: That's correct.

[State]: Is that standard practice in your office?

[Sgt. Lane]: Yes.

Sgt. Lane also stated that, although he did not request an end date for the mail cover placed on [McFarlin], the

Commissioner of Corrections gave an end date of March 4, 2004. Sgt. Lane stated, however, that he was not aware of the end date until he saw the document on April 21, 2004, after Lt. Wilson informed him about [McFarlin's] letter. At that time, Sgt. Lane requested another mail cover, without an end date, "and forwarded that to the Commissioner of Corrections." This second mail cover was approved on April 28, 2004.

Karen Gardner ("Gardner"), a mailroom clerk at MCAC, was the last person to testify. She stated that she has enforced over 50 mail covers and that "[m]ost of the time [a mail cover] does not have an expiration date." With regard to the mail cover on [McFarlin], Gardner stated, "I thought it was indefinite. Because I have some that's [sic] indefinite." To explain the procedure for mail covers, she stated:

[Gardner]: [The envelope is] already open. So I just take the letter out.

[Gardner]: Take it to the copier; copy it, with the envelope; put it back in its original form; seal it, stamp it, and send it to its destination, and give the copy to [Lt. Wilson].

Gardner further stated that, beginning on February 4, she "started copying all incoming and outgoing correspondence that had [McFarlin's] name on it" and that she processed the letter in question on April 13, 2004. Gardner also testified as follows:

[State]: And from the time that you began the mail cover on [McFarlin] back in February, was there ever a time prior to you seeing this letter that anybody advised you to stop the mail cover?

[Gardner]: No sir.

\* \* \*

[State]: So you continue until somebody tells you to stop, is that fair to say?

[Gardner]: Yes.

[State]: Nobody told you to stop on April 13th?

[Gardner]:  No, sir.

The Circuit Court denied McFarlin's motion to suppress and admitted the letter into evidence.  In an unreported opinion, the Court of Special Appeals upheld the Circuit Court's decision, holding that the Fourth Amendment right to privacy did not protect McFarlin's letter from inspection.  The intermediate appellate court reasoned that "an inmate in a maximum security correctional facility could expect an *unsealed* letter to be read, inspected, seized, or used as evidence in trial, even if he is not told that such actions would take place."  The intermediate appellate court also noted that due to the State's legitimate security needs, MCAC officers were entitled to intercept McFarlin's mail.

In addition, the Court of Special Appeals rejected McFarlin's contention that COMAR 12.02.20.04E [6] is unconstitutionally vague because the regulation does not explain or identify what kind of "clear evidence" is required to warrant the inspection of an inmate's outgoing mail.  Analyzing the regula-

---

**6.**  COMAR 12.02.20.04 provides:
**Outgoing Mail**
A.  The warden shall ensure that all outgoing mail is date stamped on the date the mail is received by staff who are assigned to forward mail to the United States Postal Service or courier.
B.  Outgoing mail may not be held for more than 24 hours excluding weekends and holidays, except as provided in § E(1) and (2).
C.  The inmate shall include the inmate's name, commitment number, and the return address of the institution on outgoing mail.
D.  If the inmate desires to mail money from the inmate's account with a letter, the inmate shall forward the letter and unsealed envelope, together with the proper withdrawal slips, to the person or department designated by internal detectives.
E.  Outgoing mail may not be opened unless **clear evidence** exists to warrant inspection.  The warden or designee shall:
   (1) Make the decision to open and inspect outgoing mail and shall ensure that the reasons for and results of the inspection are documented;
   (2) Withhold outgoing mail only when it is:
   (a) Found to contain contraband,
   (b) Evidence of a violation of a rule or regulation, or
   (c) A basis for requesting an investigation by the Department's investigative unit or a law enforcement agency.
(emphasis added).

tion under the void-for-vagueness doctrine, the intermediate appellate court concluded that the regulation passed the fair notice and enforcement criteria. First, the Court of Special Appeals stated that it is "fairly ascertainable that 'clear evidence' relates to security and safety matters, as MCAC is a high security penal institution." Then, the court determined that because COMAR 12.02.20.04 specifically applies only to inmates' outgoing mail, the regulation is not so broad that it is likely be interpreted irrationally.

McFarlin petitioned this Court for certiorari and we granted his petition to consider the following question: "Was it error to admit into evidence a letter sent from prison by Petitioner McFarlin to his father?" *McFarlin v. State,* 406 Md. 579, 961 A.2d 553 (2008).

## II.

The State urges the Court to affirm the judgment of the Court of Special Appeals. Citing *Thomas v. State,* 285 Md. 458, 404 A.2d 257 (1979), the State avers that this Court has already ruled that there is no Fourth Amendment Right to privacy in inmate mail. Moreover, the State argues that the principle recognized in *Thomas,* "that inmates do not have a Fourth Amendment right regarding their mail—or at least no right which trumps the security and penalogical needs of the institution—" is widely recognized.

In addition, the State posits that to the extent the issue is preserved, COMAR 12.02.20.04E was not violated in this case. The State points out that 12.02.20.04 expressly grants a warden the power to make decisions to open and inspect outgoing mail and that, because of the nature of MCAC and the inmates transferred to it, Warden Peguese justifiedly determined there was reasonable cause to inspect McFarlin's mail. Moreover, the State asserts that even if there was a violation of COMAR 12.02.20.04, a violation of a State regulation does not trigger the exclusionary rule. The State contends that the exclusionary rule is "applied exclusively to violations of the Fourth Amendment to the United States Constitution and not

to COMAR violations" and as such, the relief that McFarlin seeks is "simply not available in the instant case." Finally, the State avers that COMAR 12.02.20.04 is not vague and even it were, this is "fundamentally irrelevant" because a regulation "which is so vague as to be invalid cannot form the cornerstone of a Fourth Amendment expectation of privacy."

McFarlin argues that the judgment of the Court of Special Appeals should be reversed. He contends that it was error for the trial court to admit his letter into evidence. McFarlin posits that a prisoner's right to correspond is a fundamental right protected by the First Amendment and not merely a privilege. Moreover, McFarlin asserts that he had a Fourth Amendment right to privacy in the letter that he sent to his father and that MCAC's seizure of the letter was unreasonable. McFarlin contends that he had an expectation of privacy in the letter that society is prepared to recognize as reasonable because he relied on MCAC's policies pertaining to correspondence when sending the letter. Specifically, McFarlin maintains that although MCAC's inmate manual instructed inmates not to seal any outgoing correspondence, the manual did not indicate that outgoing correspondence was subject to being read or inspected for content. McFarlin avers:

> It was not "reasonable" for the State prison system to ... give notice to inmates of policies restricting the State's use of the content of mail, thereby, inducing inmates to rely upon a reasonable and limited expectation of privacy created by those policies, and then search letters for incriminating statements as to past crimes, at least, in the absence of a valid Order from the Commissioner, based on a showing of good cause.

McFarlin also renews his argument that COMAR 12.02.20.04E did not justify the State's action of unconstitutionally seizing his letter to his father. McFarlin asserts that the regulation is void-for-vagueness because it does not specify what type of clear evidence, or clear evidence of what kind of activity, is required to inspect an inmate's mail.

## III.

### A. *Standard of Review*

In reviewing a circuit court's grant or denial of a motion to suppress evidence, we ordinarily consider only the evidence contained in the record of the suppression hearing. The factual findings of the suppression court and its conclusions regarding the credibility of testimony are accepted unless clearly erroneous. We review the evidence and the inferences that may be reasonably drawn in the light most favorable to the prevailing party. We undertake our own constitutional appraisal of the record by reviewing the law and applying it to the facts of the present case.

*Rush v. State*, 403 Md. 68, 82, 939 A.2d 689, 697 (2008) (citations omitted).

### B. *Fourth Amendment Analysis*

We hold that McFarlin's constitutional rights were not violated when MCAC inspected McFarlin's letter to his father and provided a copy of the letter to State officials. Accordingly, we hold that the suppression court did not err in denying the suppression motion. Initially, we conclude that McFarlin did not have an expectation of privacy in his letter to his father that was objectively reasonable. Alternately, we conclude that under our holding in *Thomas*, even if we were to assume that McFarlin had an objectively reasonable expectation of privacy in his letter to his father, MCAC's seizure of the letter did not violate McFarlin's Fourth Amendment rights because the seizure was justified by MCAC's legitimate concern for security.

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The Fourteenth Amendment to the United States Constitution makes the protections of the Fourth Amendment applicable to the States. *Paulino v. State*, 399 Md. 341, 349, 924 A.2d 308, 313 (2007). To invoke the protections of the Fourth Amendment,

an individual bears the burden of demonstrating that he or she had "a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220, 226 (1979). In *Laney v. State*, 379 Md. 522, 545, 842 A.2d 773, 786–87 (2004), we explained that this burden consists of two inquiries: "(1) whether the individual has a subjective expectation that his or her property or possessions will not be searched, and (2) whether the expectation is objectively reasonable under the circumstances." *Accord Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 588 (1967) (Harlan, J., concurring) (noting that there is a "twofold requirement" to invoke the protection of the Fourth Amendment: "first ... a person [must] have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as reasonable").

A defendant demonstrates a subjective expectation of privacy by showing that he or she sought "to preserve something as private." *Whiting v. State*, 389 Md. 334, 349, 885 A.2d 785, 793 (2005) (quoting *Smith*, 442 U.S. at 740, 99 S.Ct. at 2580, 61 L.Ed.2d at 226). To establish that the subjective expectation of privacy was objectively reasonable, a defendant must demonstrate that the law is prepared to recognize the expectation as "legitimate." *Rakas v. Illinois*, 439 U.S. 128, 148, 99 S.Ct. 421, 433, 58 L.Ed.2d 387, 404 (1978) (noting that an objectively reasonable expectation of privacy is "more than a subjective expectation of not being discovered"). Whether the law recognizes an expectation of privacy as legitimate varies by context and can "depend on an individual's relationship with the State." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654, 115 S.Ct. 2386, 2391, 132 L.Ed.2d 564, 575 (1995). As a consequence of their relationship with the State, inmates have lower expectations of privacy than non-incarcerated individuals. *Hudson v. Palmer*, 468 U.S. 517, 524, 104 S.Ct. 3194, 3199, 82 L.Ed.2d 393, 401 (1984) (holding that while "persons imprisoned for a crime enjoy many protections of the Constitution, it is also clear that

imprisonment carries with it the circumscription or loss of many significant rights"); *see also Bell v. Wolfish,* 441 U.S. 520, 546, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447, 473 (1979) ("The fact of confinement as well as the legitimate goals and policies of the penal institution limits [a prisoner's] retained constitutional rights.").

As recited above, McFarlin asserts that despite his incarceration, he had a "limited and reasonable" expectation of privacy in his letter to his father. McFarlin also argues that in light of the mail policies contained in MCAC's "Inmate Orientation Manual," his expectation of privacy was objectively reasonable. The record indicates that all MCAC inmates receive a copy of the Inmate Orientation Manual upon arrival at MCAC. In pertinent part, this Manual provides:

Inmate Mail and Reading Material

VI. Procedure:

A. **Inmates at MCAC will not seal any outgoing correspondence.** The managing officer shall designate the appropriate staff to be responsible for ensuring that the correspondence is sealed before it leaves the facility.

B. **Inmates at all facilities except MCAC may seal their own correspondence** . . . .

C. Incoming mail must bear the name and number of the inmate and will be opened before delivery to the inmate and inspected only for money orders, cash, stamps, checks, or contraband . . . .

D. Legal mail will be opened and inspected only in the presence of the inmate. Where there is reason to believe the mail is not bonafide legal mail, the mail shall be opened and inspected only in the presence of the inmate.

E. Outgoing mail will not be opened, unless there exists clear and convincing evidence to warrant inspection. In this event, the reasons and inspection will be documented. The Managing Officer or designees shall make the decision to open and inspect outgoing mail and shall ensure that the reasons for and results of the inspection are documented. The Managing Officer or designees shall withhold outgoing

mail only when it is found to contain contraband, is evidence of violation of a rule and/or regulation, or is the basis for requesting an investigation by the Division of Correction Internal Investigation Unit or any law enforcement agency.

(emphasis added).

In our view, the Inmate Orientation Manual does not support McFarlin's contention that he had an objectively reasonable expectation of privacy in his mail. In fact, section VI. A. of the Manual makes clear that inmates at MCAC do not have the same mail privileges as inmates at other institutions. Because inmates at MCAC may not seal or close their outgoing correspondence, as inmates at all other institutions in Maryland may, the provisions of VI. E, which dictate when outgoing correspondence may be opened, do not apply to MCAC inmates. The outgoing mail of MCAC inmates remains open until institutional officials inspect it and seal it for delivery. Warden Peguese provided testimony at the suppression hearing that explained that *all* outgoing mail at MCAC is inspected for contraband and content due to the fact that the inmates detained at MCAC are individuals that have been moved from other prison populations because they were disruptive, had created disturbances, or had engaged in violence while in prison. Thus, even if we are to assume that McFarlin had a subjective expectation of privacy in his letter, we hold that under the circumstances of this case, it was not objectively reasonable for McFarlin, an inmate at the highest security penal institution in the State, to believe that the outgoing letter that he placed in an unsealed envelope would not be inspected. *Accord State v. McCoy*, 270 Or. 340, 527 P.2d 725, 728 (1974) (holding that a defendant's rights under the Fourth Amendment were not violated when a sheriff read and copied outgoing mail that the defendant gave to the sheriff for delivery in an unsealed envelope); *State v. Wiley*, 355 N.C. 592, 565 S.E.2d 22, 32 (2002) (concluding that even if an incarcerated defendant had a subjective expectation of privacy in a letter placed in an unsealed envelope and given to jail personnel for delivery, the expectation was not objectively reasonable).

■   Alternatively, we hold that under this Court's decision in *Thomas*, MCAC's seizure of McFarlin's letter to his father was justified by MCAC's legitimate concern for security and thus, did not violate the Fourth Amendment regardless of any expectation of privacy that McFarlin might have had in the letter.  In *Thomas*, an inmate handed a correctional officer a letter in a sealed envelope for delivery to another inmate. *Thomas*, 285 Md. at 459, 404 A.2d at 258.  The officer opened the letter and after discovering that it contained an inculpatory statement, turned it over to officials at the State's Attorney's office.  *Id.*  Thomas was unaware of any institutional regulation that governed correspondence between inmates. *Thomas*, 285 Md. at 462, 404 A.2d at 259.

After reviewing the case, the *Thomas* Court held that even if an inmate has a reasonable expectation of privacy in his or her correspondence, this expectation can be outweighed by the security interests of a correctional institution, "thereby rendering [a search] 'reasonable' within the meaning of the Fourth Amendment."  *Thomas*, 285 Md. at 468, 404 A.2d at 263.  The Court reasoned:

> Assuming that the defendant had some reasonable expectation of privacy with regard to the envelope because of the absence of notice informing him that the contents would be inspected ... no "probable" cause or "reasonable suspicion" that the envelope contained contraband, escape plans, etc., need be shown.  Rather, the question is whether this type of search is justified by the institution's legitimate concern for security.  There can be little doubt that it is so justified. A detention center or correctional institution clearly has a reasonable security interest in knowing what one inmate is communicating or sending to another.

* * *

Although we believe it would be preferable for jails, detention centers and correctional institutions in this State to inform inmates, by regulation, posted notice or otherwise, concerning inspection of inmate to inmate correspondence, nevertheless whatever privacy expectations the defendant

Thomas may have had regarding the sealed envelope were outweighed by the legitimate security needs of the detention center.

*Thomas,* 285 Md. at 468–69, 404 A.2d at 263.

McFarlin attempts to distinguish *Thomas* by arguing that its holding does not apply to the facts of this case. McFarlin points out that *Thomas* involved a letter from one inmate to another rather than a letter from an inmate to a family member. He also relies on the Inmate Orientation Manual, referenced *supra,* to argue that here, unlike in *Thomas,* "there was no absence of a regulation" pertaining to the correspondence at issue. Although we agree that there are some factual distinctions between McFarlin's case and the facts presented in *Thomas,* we conclude that the principles articulated in *Thomas* are equally applicable to McFarlin's case.

*Thomas* directed that when analyzing whether a search of inmate correspondence violates the Fourth Amendment, the key inquiry is whether the search was "justified by the institution's legitimate concern for security." *Id.* As noted above, MCAC is a maximum level II prison facility that houses males who have demonstrated a high propensity for violence or institutional misconduct. At the suppression hearing, Warden Peguese testified that due to MCAC's serious safety concerns, all mail at the institution is routinely inspected "with or without" a mail cover. Warden Peguese also testified that MCAC had a specific interest in inspecting McFarlin's mail because officials needed to determine if the death of Damon Bowie was retaliatory and related to gang conflict. Upon reviewing the evidence presented at the suppression hearing in the light most favorable to the State, we conclude that the admission of McFarlin's letter to his father as evidence at McFarlin's trial was not in violation of McFarlin's constitutional rights.[7] Like the defendant in *Thomas,* any privacy expec-

---

7. We do not find this holding inconsistent with *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), *rev'd on other grounds, Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). In *Procunier,* the Court considered when censor-

tations that McFarlin might have had regarding his letter to his father were outweighed by MCAC's legitimate security needs.  *See Sparkman v. State*, 184 Md.App. 716, 968 A.2d 162 (2009) (holding under *Thomas,* a prison official's act of reading an inmate letter contained in an envelope marked "return to sender" did not offend the inmate's rights under the Fourth Amendment); *cf. Stroud v. United States,* 251 U.S. 15, 21–22, 40 S.Ct. 50, 53, 64 L.Ed. 103, 111 (1919) (holding that the Fourth Amendment is not violated when prison officials seize inmate correspondence pursuant to rules and regulations designed to promote safety and other goals of the penal institution); *United States v. Whalen,* 940 F.2d 1027, 1035 (7th Cir.1991), *cert. denied,* 502 U.S. 951, 112 S.Ct. 403, 116 L.Ed.2d 352 (1991) ("Because of their reasonable concern for

---

ship of inmate correspondence violates the First Amendment, not whether a correctional institution's act of reading inmate mail violates the Fourth Amendment.  *Procunier,* 416 U.S. at 405–06, 94 S.Ct. at 1808, 40 L.Ed.2d at 236.  *Procunier* is relevant, however, because there, the Court recognized that legitimate government interests can justify the restraint on inmate correspondence.  Specifically, the Court stated:

> One of the primary functions of government is the preservation of societal order through enforcement of the criminal law, and the maintenance of penal institutions is an essential part of that task. The identifiable governmental interests at stake in this task are the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners.  While the weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation, the legitimate governmental interest in the order and security of penal institutions justifies the imposition of certain restraints on inmate correspondence.  Perhaps the most obvious example of justifiable censorship of prison mail would be refusal to send or deliver letters concerning escape plans or containing other information concerning proposed criminal activity, whether within or without the prison.

*Procunier,* 416 U.S. at 412–13, 94 S.Ct. at 1811, 40 L.Ed.2d at 239–40; *accord* Wayne R. LaFave, *Search and Seizure A Treatise on the Fourth Amendment* (4th ed. 2004) ("[C]ourts have . . [held] that *Procunier v. Martinez* . . . recognized the maintenance of jail security as a legitimate government interest and that 'since censorship was held to be justifiable under certain circumstances, then, by implication, it appears that the mere reading of prisoners' mail is permissible.") (quoting *State v. Matthews,* 217 Kan. 654, 538 P.2d 637, 642 (1975)).

prison security and inmates' diminished expectation of privacy, prison officials do not violate the Constitution when they read inmates' outgoing letters.") (quoting *United States v. Brown,* 878 F.2d 222, 225 (8th Cir.1989)).

### C. *Void–For–Vagueness Analysis*

As an initial matter, we note our agreement with the State's contention that "even if there was a violation of COMAR 12.02.20.04, a violation of a State regulation does not trigger the exclusionary rule." The exclusionary rule generally applies only to violations of the Fourth Amendment. *MVA v. Richards,* 356 Md. 356, 368, 739 A.2d 58, 65 (1999) (explaining that the Fourth Amendment exclusionary rule is ... a "judicially created means of deterring illegal searches and seizures."); *cf. Parker v. State,* 402 Md. 372, 406, 936 A.2d 862, 882 (2007) (noting that under some circumstances evidence is inadmissible if it is obtained in violation of Maryland's common law "knock and announce" principle). Because we have held that the Fourth Amendment was not violated in this case, McFarlin's argument in relation to COMAR 12.02.20.04E is not relevant.

Despite the above determination, we also note that we agree with the Court of Special Appeals' conclusion that COMAR 12.02.20.04E is not unconstitutionally vague. In *Galloway v. State,* 365 Md. 599, 781 A.2d 851 (2001), this Court provided an extensive examination of the void-for-vagueness doctrine. There, we explained that a statute must be "sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties," otherwise, the enactment is void-for-vagueness. *Galloway,* 365 Md. at 614, 781 A.2d at 860 (quoting *Williams v. State,* 329 Md. 1, 8, 616 A.2d 1275, 1278 (1992)). We then summarized the requisite void-for-vagueness analysis as follows:

A well grounded principle in federal constitutional law is that, when considering the void-for-vagueness doctrine, courts consistently consider two criteria or rationales. The first rationale is the fair notice principle that persons of

ordinary intelligence and experience be afforded a reason-
able opportunity to know what is prohibited, so that they
may govern their behavior accordingly. The standard for
determining whether a statute provides fair notice is wheth-
er persons of common intelligence must necessarily guess at
the statute's meaning. A statute is not vague under the fair
notice principle if the meaning of the words in controversy
can be fairly ascertained by reference to judicial determina-
tions, the common law, dictionaries, treatises or even the
words themselves if they possess a common and generally
accepted meaning.

The second criterion of the vagueness doctrine regards
enforcement of the statute. This rationale exists to ensure
that criminal statutes provide legally fixed standards and
adequate guidelines for police, judicial officers, triers of fact
and others whose obligation it is to enforce, apply and
administer the penal laws. To survive analysis, a statute
must eschew arbitrary enforcement in addition to being
intelligible to the reasonable person.

*Galloway*, 365 Md. at 615–16, 781 A.2d at 860–61 (citations
omitted).

McFarlin argues that COMAR 12.02.20.04 is unconstitution-
ally vague because subsection E of the regulation provides
that "[o]utgoing mail may not be opened unless clear evidence
exists to warrant inspection," yet, does not inform what consti-
tutes "clear evidence." In other words, McFarlin asserts that
the statute is unconstitutionally vague because it begs the
question, "clear evidence of what?" We do not find COMAR
12.02.20.04 void-for-vagueness. As the Court of Special Ap-
peals noted in its opinion in this case, McFarlin had fair notice
that "clear evidence" under COMAR 12.02.20.04E "relates to
security and safety matters, as McFarlin is incarcerated in a
high security penal institution." We also agree with the Court
of Special Appeals's conclusion that "because COMAR
12.02.20.04 specifically applies only to inmates' outgoing mail,
it is not so broad that it would likely be interpreted irrational-
ly." *See Bowers v. State*, 283 Md. 115, 122, 389 A.2d 341, 346
(1978) (A criminal statute is not void "merely because it allows

for the exercise of some discretion on the part of law enforcement and judicial officials. It is only where a statute is so broad as to be susceptible to irrational and selective patterns of enforcement that it will be held unconstitutional. . . .").

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY COSTS.**