66 A.3d 93

MADISON PARK NORTH APARTMENTS, L.P.

v.

The COMMISSIONER OF HOUSING & COMMUNITY DEVELOPMENT.

No. 0071, Sept. Term, 2012.

Court of Special Appeals of Maryland.

May 3, 2013.

the same, depending upon how the judge weighs the various factors on remand.

**678**

Thomas M. Wood IV & Brian M. Boyle, (Neuberger, Quinn, Gielen, Rubin & Gibber, PA, on the brief), Baltimore, MD, for Appellant.

Daniel J. Sparaco, (Baltimore City Law Department, on the brief), Baltimore, MD, for Appellee.

Panel: WRIGHT, KEHOE, NAZARIAN, JJ.

WRIGHT, J.

This appeal arises from a decision of the Circuit Court for Baltimore City denying appellant's, Madison Park Partnership's ("Madison Park"), Petition for a Writ of Administrative Mandamus & Petition for Judicial Review ("Petition"). The Petition sought reversal of a decision by appellee, the Commissioner[1] of the Baltimore City Department of Housing and Community Development ("Department"), revoking Madison Park's Multiple–Family Dwelling License.

## Questions Presented

Madison Park presented the following three questions for our review:

1. Did the Circuit Court err when it ruled that the regulation requiring multiple family license holders to "prevent" criminal activity was not void for vagueness?

2. Did the Circuit Court err when it found the Commissioner had not violated [Madison Park]'s due process rights?

3. Did the Circuit Court err in affirming the Commissioner's Decision was supported by competent, material, and substantial evidence?

---

1. The hearing was conducted by a designee of the actual Commissioner. However, for purposes of this opinion, we will use the term "Commissioner" to refer to both the hearing examiner and the appellee.

The Commissioner asks an additional question in its reply brief:

In the absence of legislative authorization, does [Madison Park] have the right to take an appeal of [the Commissioner]'s determination to this Court?

For the reasons set forth below, we find the Commissioner's decision to be supported by substantial evidence and affirm the decision of the circuit court.

## Facts and Procedural History

Madison Park owns and operates Madison Park North Apartments ("MPNA"), comprising approximately two city blocks along North Avenue in Baltimore City. MPNA consists of twenty-six apartment buildings and fifty-two townhouses, totaling over two hundred units. The North Avenue area where MPNA is located is notorious for crime, particularly rampant drug trafficking and associated violence.

By letter dated August 16, 2010 ("Notice of Hearing"), the Commissioner notified Madison Park that the Department would hold a hearing on September 9, 2010, to "determine if the [License] for the property should be revoked." The Notice of Hearing cited Baltimore City Code ("BCC"), Art. 13, §§ 5–15 and 5–16, which state:

### § 5–15. Revocation of license—In general.

Subject to the hearing provisions of § 5–16 of this subtitle, the Commissioner may revoke a license if the Commissioner finds, or if the Fire Chief, Health Commissioner, or Police Commissioner certify to the Commissioner, that:

(1) the owner or lessee of a multiple-family dwelling or rooming house has failed to comply with any lawful notice or order to correct a violation that affects the health, safety, morals, or general welfare of the occupants of the property or of the general public; or

(2) the owner or lessee of a multiple-family dwelling or rooming house, or any agent of the owner or lessee:

(i) has allowed the premises to be used for the purpose [of] prostitution, drug trafficking, or other criminal activity or

for any other activity that creates or constitutes a nuisance; or

(ii) knew or should have known that the premises were being used for one of these purposes and failed to prevent them from being so used.

### § 5–16. Revocation of license—Notice and hearing.

(a) *In general.*

No license may be revoked unless the Commissioner first gives the licensee:

(1) not less than 10 days notice in writing of the Commissioner's intent to revoke the license; and

(2) an opportunity to be heard as to why the license should not be revoked.

(b) *Exception.*

The Commissioner may revoke a license without prior notice and opportunity to be heard if, in the opinion of the Commissioner or the Fire Chief, Health Commissioner, or Police Commissioner, the health, safety, or welfare of the occupants or of the general public are in imminent danger.

The Notice of Hearing cited numerous instances where the police responded to crime at the complex and stated:

> There is sufficient evidence to establish that MPNA is being used for the purposes of drug usage, storage and trafficking and other drug-related activity that creates and constitutes a nuisance, as well as violent criminal activity constituting a nuisance, and that you knew or should have known that the premises were being used for these purposes and failed to prevent such use. By letter dated October 3, 2008, I alerted you to the overwhelming amount of serious, illegal drug activity, including drug-related crimes of violence, at MPNA in the hope that you would take whatever steps were necessary to prevent the premises from being so used. Unfortunately, you have failed to prevent the premises from being so used. Between October 3, 2008 and August 7, 2010, the police have been called to [the complex] hundreds of times....

It also stated, "You have the right to be heard and represented at the hearing. Failure to appear at the hearing will not prevent the Commissioner or the Commissioner's designee from issuing a default order to revoke the [License]. In revoking the [License], neither the Commissioner, the [Department], nor the City of Baltimore are taking possession, ownership or control of the property." The Notice of Hearing further explained where the hearing would be held and the procedures Madison Park should follow to request a postponement.

The Rules adopted by the Commissioner, pursuant to BCC Art. 13, § 5–2, gave Madison Park the right to present evidence, call witnesses, make objections and argument, and established that the Commissioner "may revoke a license upon a finding by a 'preponderance of the evidence....' " Madison Park was granted a postponement by letter dated September 2, 2010, and the hearing was rescheduled for September 22, 2010. Settlement attempts were unsuccessful between the parties prior to the hearing.

On September 22 and 23, 2010, the Commissioner conducted the revocation hearing. Testimony was taken from four Baltimore City police officers, a City official, a general partner of Madison Park, MPNA's property manager and maintenance supervisor, the commanding officer of the security company hired to police MPNA, a property management consultant, several MPNA residents, and a neighborhood community organizer. The Commissioner received into evidence 55 exhibits from the Department, including 49 police reports and other documentation of criminal activity in or around MPNA and 11 exhibits from Madison Park. Madison Park introduced evidence regarding how it had implemented crime-reduction measures at MPNA.

On October 15, 2010, the Commissioner issued a decision and order revoking Madison Park's License. In its decision, the Commissioner stated in part: [2]

---

**2.** All internal citations to the record and footnotes have been omitted from the quotations of the Commissioner's decision.

There was substantial credible testimony about the amount of crime at the complex. Major [Dennis] Smith [of the Baltimore Police Department ("BPD")] testified that the complex is "the most violent area in my district" ... [and] ... there are "at least three drug shops that I know of in the complex [or] related to the complex."

\*　　\*　　\*

Major Smith testified that the shops deal right out of the complex, and that "[s]everal of the players use the apartments to package their narcotics, store their narcotics."

Lt. [Dorsey] McVicker [of the BPD] also testified that M[PNA] was used for drug trafficking, and named one dealer in particular....

Sgt. [Harvey] Martini [of the BPD] testified that he executed search and seizure warrants at "numerous locations" within the complex, based in part on sending confidential informants to purchase narcotics from someone in the complex. He testified that drugs were "stashed on the grounds, under the steps, in the stairwells, in the cellar parts, the basement parts of the buildings," as well as in tenants' mailboxes.... Sgt. Martini concluded, "Due to the sheer volume of people that were in that complex," the volume of crime was "worse in the complex" than it was in the Reservoir Hill neighborhood generally....

The extensive evidence of criminal activity at the complex, including [Department] exhibits 1–49, which are a collection of police documents showing mostly drug-trafficking related incidents on the property, was separately corroborated by a key MPNA witness, Lt. [Kirk] Kluver, commander of [MPNA]'s security forces....

The Commissioner found Lt. Kluver's testimony to be less credible than that of the BPD officers, and found that "Lt. Kluver suggested that crime had substantially dropped-off in the complex, but it was clear he was, at best, referring to the past month or two." Overall, the Commissioner "found the testimony of the witnesses from BPD to be credible because it

was candid, unrehearsed, and did not appear to be self-serving." In contrast, the Commissioner found

> that much of [Lt. Kluver's] testimony concerning the effectiveness of his own security efforts and what he called the diminishing amount of crime at the complex to be much less credible. It was contradicted by other substantial evidence of criminal activity.... I do not doubt Lt. Kluver's desire to see progress and improved security at the complex, but statements such as these [that no drug shops currently operate in MPNA], in light of the evidence, amount to an exaggeration of the success of the work of his security company.

Regarding Madison Park's plans and efforts to prevent crime, the Commissioner found:

> Ms. [Shelby] Kaplan [the general partner of Madison Park] received a letter from Commissioner Graziano, in October 2008 [after Madison Park no longer employed off-duty BPD officers as security personnel]. Subsequent to receiving the letter, Ms. Kaplan, together with other managers of the complex, Ms. Lumley and Ms. Sherwell, met with City and BPD representatives to explain MPNA's efforts to reduce crime at the complex.

> MPNA developed a "strategic plan" in response to the Commissioner's letter of October 2008 and a subsequent meeting with the City and police. That plan, submitted to the City by letter dated March 16, 2009, outlined a variety of steps MPNA claimed it had taken or would take in recognition of "the seriousness of drugs in our community."

> * * *

> The March 2009 strategic plan was an updated version of the earlier plan prepared by Ms. Kaplan years before, in 2004 or 2005, addressing similar issues at the behest of City officials concerned about crime....

> * * *

MPNA's most recent strategic plan, from March 2009, references Central Maryland Security Services, hired by Ms. Kaplan after Martini's off-duty security services ended.

\* \* \*

Lt. Kluver is a Special Police Officer, granted all of the powers of a BPD officer by the BPD itself, but he may only operate within the complex itself and the streets surrounding the complex. He began working for MPNA at the complex two years ago. The commander of Central Maryland Security Services team at the complex, Lt. Kluver recalled working two-man shifts of 16 hours when he first began, running from 8:00 in the morning until 12:00 midnight. However, the March 2009 strategic plan—which was drafted at or near the time Lt. Kluver began working for MPNA—says Central Maryland Security Services was hired to provide security at the complex for "8 hours per day, 7 days per week." While MPNA introduced some 2010 invoices from the security firm, no invoices or contracts were introduced into evidence to establish the amount of security coverage any time prior to July 2010.

The increase in security coverage to which some MPNA witnesses testified corresponds, at least temporally, to the Commissioner's Notice letter of August 15, 2010. An August 24, 2010 letter written by MPNA's attorney in response to that Notice acknowledged that "Admittedly . . . a substantial amount of criminal activity remains."

Notwithstanding this recent increase in security staffing at the complex, I find that the complex is being used for the purpose of drug trafficking. I also find that MPNA's response to the drug trafficking has been uncoordinated and inadequate.

Under "Conclusions of Law," the Commissioner stated:

I find, under Baltimore City Code, Art. 13, § 5–15(2)(ii) that [the Department] has established by a preponderance of the evidence that Madison Park North Apartments, Ltd. knew or should have known that the premises are being

used for the purpose of drug trafficking, and failed to prevent them from being so used.

* * *

Given the number of search and seizure warrants executed on the premises, the number of arrests involving narcotics trafficking activities on the premises, and the number of violent crimes that have occurred on the property, many of which are described in [Department] exhibits 1–49, it would be impossible for a reasonable landowner not to know that The premises were being used for the purposes of drug trafficking.

I needn't dwell, however, on what a reasonable landowner would know, because MPNA and its agents were directly told of police efforts to interdict that activity, and took steps to inform themselves of the state of the complex.

* * *

[MPNA] attempts to disclaim knowledge of crime at the complex on the grounds that BPD failed to provide management with copies of police reports. But the fact that drug trafficking and violent crime are regularly occurring on the premises are notice in their own right of the fact that such activity exists.

The Commissioner cited testimony from Veronica Coward, MPNA's on-site property manager, who acknowledged that police reports are necessary to effectuate evictions, but only made "four or five" telephone calls since 2008 before abandoning attempts to obtain reports. The Commissioner noted that "MPNA could have made requests in writing, which Ms. Coward testified she never did" and that Madison Park's counsel "could have obtained police documents through official channels that MPNA's on-site staff could not."

Addressing Madison Park's argument that "it is impossible to stop drug trafficking," the Commissioner stated:

MPNA misapprehends the issue. The purpose of this proceeding is not to determine whether or how the narcotics trade, crimes of violence, or other crimes that constitute a

nuisance can be stopped altogether, or what constitutes the ideal amount of security at the complex or apartments like it. I find that MPNA failed to prevent the complex from being used for drug trafficking because the evidence demonstrates that M[PNA] failed to develop and implement a coherent security strategy to deter crime and prevent the nuisance within the two, fenced-in city blocks comprising the complex, blocks under MPNA's exclusive control. In other words, while reasonable people may disagree about the best security strategy for the complex, Respondent has demonstrated it really had no cogent strategy at all.

The Commissioner exhaustively explained the items left "incomplete or abandoned" from Madison Park's strategic plans and noted that "others appear unrelated to the objective of preventing the premises being used for drug trafficking." The Commissioner also noted that, regarding the fence around MPNA, Madison Park "pursued the exact opposite of the strategy recommended by its own security staff as well as each BPD officer who testified [and] put forth no coherent reasons for its approach." The Commissioner found that "[a]fter receiving two days of testimony and documentary evidence regarding the present state of the complex, I find ... that MPNA is slow to appreciate the urgency of the situation. The evidence shows the complex is being used for the purpose of drug trafficking, and MPNA's response has been confused and inadequate."

On October 28, 2010, Madison Park filed the Petition. After multiple postponements, a hearing on the Petition was held on February 6, 2012. On February 21, 2012, the circuit court denied the Petition, and its opinion and order were entered on March 5, 2012.

In its decision, the circuit court noted that although the Petition "states that it is both an administrative mandamus action and a request for judicial review, it has been brought pursuant to Rule 7–401 [3] et seq. and not Rule 7–201 [4] et

---

3. Maryland Rule 7–401, providing for administrative mandamus, states in pertinent part: "The rules in this Chapter govern actions for judicial

seq." The circuit court stated that it was limited to reviewing the record to "determine whether the [Commissioner's] decision is supported by competent, material and substantial evidence" and to "ensure that the agency's decision is constitutional and not arbitrary, capricious, or an abuse of discretion." The circuit court reviewed BCC Art. 13, § 5–15 of the Baltimore City Code, and determined that it was not void for vagueness and that the Commissioner's decision finding that Madison Park had violated that section was supported by substantial evidence. The circuit court also found that Madison Park was not denied due process by the statements in the August 16, 2010 letter, because the letter was "clearly a charging document" that was distinct from the final decision of the agency.

On March 22, 2012, Madison Park noted this appeal.

Additional facts will be included in the relevant sections below.

## Discussion

### I. Right to Appeal

 Madison Park argues that the Department "declined to include a statutory mechanism for judicial review but it did not dispute [Madison Park's] right to seek review through an administrative mandamus action as provided in Maryland Rule 7–401 *et seq.*" The Commissioner conceded that Madison Park can pursue judicial review through a writ of mandamus, because the BCC contains no provision for judicial review of a decision of the Commissioner by the circuit court or any other court. We agree that Maryland law provides for divergent paths of review—statutory judicial review and review based on the writ of mandamus.

---

review of a quasi-judicial order or action of an administrative agency where review is not expressly authorized by law."

4. Maryland Rule 7–201 states in pertinent part: "The rules in this Chapter govern actions for judicial review of (1) an order or action of an administrative agency, where judicial review is authorized by statute[.]"

## A. Statutory Judicial Review

 "It is an often stated principle of Maryland law that appellate jurisdiction, except as constitutionally authorized, is determined entirely by statute, and that, therefore, a right of appeal must be legislatively granted." *Gisriel v. Ocean City Bd. of Elections,* 345 Md. 477, 485, 693 A.2d 757 (1997). "[I]t should not be thought that the Maryland Rules regulating appeals from administrative agencies . . . can grant a right of appeal." *Urbana Civic Ass'n v. Urbana Mobile Village, Inc.,* 260 Md. 458, 462, 272 A.2d 628 (1971); *see also Oltman v. Md. State Bd. of Physicians,* 182 Md.App. 65, 73, 957 A.2d 611 (2008) ("Md. Rule 7–202 does not authorize judicial review of administrative decisions"). Therefore, under the statutory avenue of review, resolution of the jurisdictional issue requires an examination of relevant provisions of the Maryland Code and Baltimore City's legislative enactments. *See Gisriel,* 345 Md. at 485, 693 A.2d 757. Upon a finding that this Court does not have jurisdiction, we must dismiss the case *sua sponte. Miller & Smith v. Casey PMN,* 412 Md. 230, 240, 987 A.2d 1 (2010); *see Prince George's Cnty. v. Beretta U.S.A. Corp.,* 358 Md. 166, 174, 747 A.2d 647 (2000).

Maryland Code (1974, 1998 Repl. Vol), § 12–301 of the Courts and Judicial Proceedings Article ("CJP") provides in pertinent part:

> Except as provided in § 12–302 of this subtitle, a party may appeal from a final judgment entered in a civil or criminal case by a circuit court. The right of appeal exists from a final judgment entered by a court in the exercise of original, special, limited, statutory jurisdiction, unless in a particular case the right of appeal is expressly denied by law.

CJP § 12–302(a) provides: "Unless a right to appeal is expressly granted by law, § 12–301 of this subtitle does not permit an appeal from a final judgment of a court entered or made in the exercise of appellate jurisdiction in reviewing the decision of the District Court, an administrative agency, or a local legislative body." *See Rogers v. Eastport Yachting Ctr., LLC,* 408 Md. 722, 732, 971 A.2d 322 (2009).

■ This Court has no jurisdiction under CJP § 12–301 "when a circuit court proceeding in substance constitutes ordinary judicial review of an adjudicatory decision by an administrative agency or local legislative body, pursuant to a statute, ordinance, or charter provision, and the circuit court renders a final judgment within its jurisdiction." *Id.* at 732, 971 A.2d 322 (quoting *Gisriel,* 345 Md. at 496, 693 A.2d 757 (citation omitted)). Put another way, if the circuit court reviews an administrative agency decision based on a statutory right to judicial review, § 12–302(a) applies. The Court of Appeals has held that because CJP

> § 12–301 does not authorize an appeal from a circuit court judgment in a statutory action for judicial review of an adjudicatory administrative decision, any right of appeal in such a case must be found in some other statute. Where no other statute authorizes an appeal in the type of case covered by § 12–302(a), the Court of Special Appeals is not authorized to entertain the appeal and must dismiss it.

*Murrell v. Mayor & City Council,* 376 Md. 170, 185, 829 A.2d 548 (2003) (citation omitted). Therefore, if the BCC provides for an appeal of the Commissioner's decision to the circuit court, this Court is without jurisdiction to entertain further review, unless authorization is found elsewhere.

The Maryland Code also authorizes appeals under the Maryland Administrative Procedure Act ("APA"). *See* Md.Code (1984, 2009 Repl. Vol.), State Government Article § 10–101 *et seq.* Regarding the appeals provisions, the *Rogers* Court explained:

> Section 10–222 of the State Government Article provides for judicial review of the final decision in a contested case decided by an administrative agency. A "contested case" is one in which, inter alia, the proceeding is before an "agency." State Government Article § 10–202(d). An "agency" is defined as: (1) an officer or unit of the State government authorized by law to adjudicate contested cases; or cases.
> (2) a unit that:
> (i) is created by general law;

(ii) operates in at least 2 counties; and

(iii) is authorized by law to adjudicate contested cases. State Government Article § 10–202(b). § 10–223(b) of the State Government Article, in pertinent part, provides: (b) Right of Appeal.—(1) A party who is aggrieved by a final judgment of a circuit court under this subtitle may appeal to the Court of Special Appeals in the manner that law provides for appeal of civil cases.

(2) An agency that was a party in the circuit court may appeal under paragraph (1) of this subsection.

*Rogers,* 408 Md. at 732–733, 971 A.2d 322 (2009) (footnote omitted).

The Commissioner and the Department are not "agencies" as contemplated by the State Government Article, described above. The Department is a local agency of Baltimore City, a corporate municipality [5] and as a result, the APA imparts no right to judicial review.

Under the statutory path, the right to judicial review, if any, would terminate in the circuit court. However, the BCC contains no provision for judicial review of any sort.[6] Conse-

---

**5.** Article 1, § 1 of the Baltimore City Charter states:

The inhabitants of the City of Baltimore are a corporation, by the name of the "Mayor and City Council of Baltimore," and by that name shall have perpetual succession, may sue and be sued, may purchase and hold real, personal and mixed property and dispose of the same for the benefit of the City, as herein provided, and may have and use a common seal, which may be altered at pleasure.

**6.** Article 13 of the Baltimore City Code contains the provisions relating to "Housing and Urban Renewal." Subtitle 5 addresses "Licensing of Multiple–Family Dwellings and Rooming Housings" and provides for a hearing as discussed, *supra,* but does not contain any provisions for appealing a decision of the Commissioner.

In contrast, subtitle 2B of Article 13 of the Baltimore City Code, addressing inclusionary housing requirements and the Inclusionary Housing Board, provides for persons aggrieved by decisions of the Commissioner to appeal to first the Board of Estimates, then to the circuit court for judicial review, then to this Court. No other subsection of Article 13 includes such a provision. *See, e.g. Urbana Civic Ass'n,* 260 Md. 458, 272 A.2d 628 (no authorization for appeal to circuit

quently, we look to see if a common law right to judicial review exists. If the common law provides for judicial review, "the principle embodied in [CJP] § 12–302(a) has no application" and we may exercise jurisdiction under CJP § 12–301. *Murrell, supra,* 376 Md. at 194, 829 A.2d 548.

## B. Writ of Mandamus

The Court of Appeals has stated that "absent ... statutory authority, we have authorized, in limited, Constitutional circumstances, the judiciary to exercise its inherent authority to review quasi-judicial decisions by administrative agencies." *S. Easton Neighborhood Ass'n, Inc. v. Town of Easton, Md.,* 387 Md. 468, 477, 876 A.2d 58 (2005) (citing *Bd. of Educ. v. Sec'y of Pers.,* 317 Md. 34, 44, 562 A.2d 700 (1989) [hereinafter *"Easton"*]; *Dep't of Natural Res. v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 223, 334 A.2d 514 (1975)). In *Criminal Injuries Comp. Bd. v. Gould,* 273 Md. 486, 500, 331 A.2d 55 (1975) (quoting *Schneider v. Pullen,* 198 Md. 64, 68, 81 A.2d 226 (1951)), the Court of Appeals explained: "The Legislature cannot, of course, interfere with the judicial process by depriving litigants from raising questions involving their fundamental rights in any appropriate judicial manner, nor can it deprive the courts of the right to decide such questions in an appropriate proceeding."

> The courts have been alert to exercise their residual power to restrain improper exercises of administrative powers whether judicial or legislative in nature. If the legislature has not expressly provided for judicial review, a court will ordinarily utilize its inherent powers to prevent illegal, unreasonable, arbitrary or capricious administrative action.

*State Ins. Comm'r v. Nat'l Bureau of Cas. Underwriters,* 248 Md. 292, 300, 236 A.2d 282 (1967).

It is well settled that "[t]he right to appeal is not a right required by due process of law, nor is it an inherent or

court or Court of Special Appeals provided in relevant statutory section although other sections contained provisions for judicial review).

inalienable right," and that the right "is entirely statutory in origin" so that there is "no right of appeal if that right is expressly excluded by statute." *Gould*, 273 Md. at 500, 331 A.2d 55 (citations omitted). However, the parties contend that review of the Commissioner's decision is possible through both administrative mandamus under Md. Rule 7–401(a) and the common law writ of mandamus, and we agree.[7]

The writ of mandamus "is in aid to appellate jurisdiction when the use of it is necessary to enable the Court to exercise appellate jurisdiction . . . 'by making possible the review of a potentially unreviewable question.' " *Homes Oil Co., Inc. v. Md. Dep't of the Env't*, 135 Md.App. 442, 762 A.2d 1012 (2000) (quoting *Philip Morris v. Angeletti*, 358 Md. 689, 711, 752 A.2d 200 (2000)). Where "the substance of the circuit court action was a common law mandamus action" and not a statutory action for judicial review, the decision is "appealable to the Court of Special Appeals under § 12–301 of the Courts and Judicial Proceedings Article." *Murrell, supra*, 376 Md. at 196–97, 829 A.2d 548; *see also Md. Transp. Auth. v. King*, 369 Md. 274, 287, 799 A.2d 1246 (2002).

During oral argument, the Commissioner directed us to *Hecht v. Crook*, 184 Md. 271, 40 A.2d 673 (1945) and *Heaps v. Cobb*, 185 Md. 372, 45 A.2d 73 (1945), which we find clearly articulate the route and scope of our review in this case.

In *Hecht*, a judge of the Appeal Tax Court retired and applied for benefits. The Board of Trustees of the Retirement System ("pension board") denied his claim and he sought a writ of mandamus to compel the pension board to allow his claim. The Court of Appeals explained:

Courts have the inherent power, through the writ of mandamus, by injunction, or otherwise, to correct abuses of discretion and arbitrary, illegal, capricious or unreasonable acts;

---

7. Md. Rule 7–401(a) states: "The rules in this Chapter govern actions for judicial review of a quasi-judicial order or action of an administrative agency where review is not expressly authorized by law." *See O'Brien v. Bd. of License Comm'rs for Wash. Cnty.*, 199 Md.App. 563, 577–79, 23 A.3d 323 (2011).

but in exercising that power care must be taken not to interfere with the legislative prerogative, or with the exercise of sound administrative discretion, where discretion is clearly conferred.

*Hecht,* 184 Md. at 280–81, 40 A.2d 673.

In *Heaps,* a widow sought pension benefits after her husband, the Chief Engineer for Baltimore City, was killed while driving a City vehicle en route to a meeting. The pension board denied her petition, and she sought relief in the circuit court by asking the court to issue a writ of mandamus directing the board to grant her petition. Exercising its review power, the *Heaps* Court explained:

> Administrative boards in general may be said to act in a quasi judicial capacity insofar as they have the duty to hear and determine facts and, based on them, to make decisions. Moreover, such decisions carry with them the presumption of validity and, where the statute or ordinance provides for an appeal to the courts, will not be disturbed on review if the record shows substantial evidence to sustain the findings. The boards, however, are not clothed with judicial authority, which the legislature has no power to confer upon them, Article 4, Md. Constitution; *Dal Maso v. Board, etc.,* 182 Md. 200, 34 A.2d 464 [ (1943) ], and their decisions, when they impair personal or property rights, are not irreviewable. The legislature is without authority to divest the judicial branch of the government of its inherent power to review actions of administrative boards shown to be arbitrary, illegal or capricious, and to impair personal or property rights; but the courts are likewise without authority to interfere with any exercise of the legislative prerogative within constitutional limits, or with the lawful exercise of administrative authority or discretion. . . .

> The appellant Board is one of those tribunals created by an ordinance which does not expressly provide for an appeal from its decisions, and, largely because of that omission, the appellant is claiming for its decision in the instant case a

finality which would place it beyond the reach of the Court in a mandamus suit.

\* \* \*

Where the statute or ordinance makes no provision for judicial review, an implied limitation upon an administrative board's authority is that its decisions be supported by facts and that they be not arbitrary, capricious or unreasonable. *Heaps,* 185 Md. at 378–80, 45 A.2d 73 (emphasis omitted).

The parties are correct that, as discussed, when a statute provides for judicial review of an administrative decision by the circuit court, pursuant to CJP § 12–301, then that is where the review ends. However, in cases like *Hecht, Heaps,* and the one *sub judice,* where the code is silent on judicial review, this Court, in a mandamus action, has the authority to review the administrative body's decision to determine if the decision was supported by substantial evidence and was not arbitrary or capricious. *Murrell, supra,* 376 Md. at 194, 829 A.2d 548; *see Beretta U.S.A. Corp., supra,* 358 Md. at 183, 747 A.2d 647 (Court of Special Appeals has no appellate jurisdiction when circuit court engages in statutory judicial review).

■ The Court of Appeals has stated that "prior to granting a writ of mandamus to review discretionary acts, there must be both a lack of an available procedure for obtaining review and an allegation that the action complained of is illegal, arbitrary, capricious or unreasonable." *Dep't of Human Res. v. Hayward,* 426 Md. 638, 647, 45 A.3d 224 (2012) (quoting *Goodwich v. Nolan,* 343 Md. 130, 146, 680 A.2d 1040 (1996)); *see also Gisriel, supra,* 345 Md. at 497, 693 A.2d 757 (1997); *Brack v. Wells,* 184 Md. 86, 90–91, 40 A.2d 319 (1944). "An agency's actions will be classified as arbitrary and capricious if they are 'unreasonabl[e] or without a rational basis....'" *Hayward,* 426 Md. at 647, 45 A.3d 224 (quoting *Harvey v. Marshall,* 389 Md. 243, 297, 884 A.2d 1171 (2005)) (quoting Arnold Rochvarg, *Maryland Administrative Law,* § 4.38 at 128 (2001, 2004 Supp.)). An agency's decision is arbitrary and capricious if it is "contrary to law or unsupported by substantial evidence." *Homes Oil,* 135 Md.App. at 457

n. 3, 762 A.2d 1012 (quoting *State Dep't of Health v. Walker*, 238 Md. 512, 523, 209 A.2d 555 (1965)).

In reviewing whether the denial of the writ of mandamus was appropriate, we are guided by the Court of Appeals:

If the action it then took had been supported by the evidence, or if there had been any disputed facts before it, its decision would not be open to judicial review. On the other hand, if at that time none of the essential facts was in dispute, but all of them combined to support the claim for pension as prescribed by the ordinance, then there was no basis for the exercise of judgment or discretion, and any action by the Board contrary to those established facts would have to be classified as "arbitrary," and subject to correction through the writ of mandamus.

*Heaps*, 185 Md. at 386, 45 A.2d 73. *See also Hayward*, 426 Md. at 649 n. 6, 45 A.3d 224; *Philip Morris, supra*, 358 Md. at 708, 752 A.2d 200 (describing the common law writ of mandamus as a "prerogative writ").

Applying this test, we first determine that no other method of review is available to Madison Park. As discussed, the BCC and the APA contain no statutory provisions for judicial review of the Commissioner's decision revoking Madison Park's license. Next, we must determine whether the Commissioner, as alleged by Madison Park, acted arbitrarily and capriciously or if the decision was supported by substantial evidence. *See Part IV, infra.* In other words, if the Commissioner's decision was supported by substantial evidence it cannot be found to be arbitrary and the circuit court's denial of the writ of mandamus must be affirmed. *Homes Oil, supra*, 135 Md.App. at 461, 762 A.2d 1012; see *also Heft v. Md. Racing Comm'n*, 323 Md. 257, 273, 592 A.2d 1110 (1991) ("A court cannot substitute its discretion for the discretion of the [agency] where there is evidence that reasonably justifies the [agency's] finding, even though the court may disagree with the [agency]."); *Bd. of Educ. of Prince George's Cnty., supra*, 317 Md. at 44, 562 A.2d 700; *In re Petition for Writ of Prohibition*, 312 Md. 280, 305–06, 539 A.2d 664 (1988); *Tabler*

*v. Med. Mut. Liab. Ins. Soc'y,* 301 Md. 189, 202 n. 7, 482 A.2d 873 (1984); *Bovey v. Exec. Dir. Health Claims,* 292 Md. 640, 649, 441 A.2d 333 (1982).

## II. Void for Vagueness

██ Madison Park contends that the regulation's "full logical requirements are impossible to comprehend and which by its terms is an open invitation for arbitrary and capricious enforcement." According to Madison Park, BCC Art. 13, § 5–15 provides no guidance "as to what actions licensees must take to avoid revocation" and compliance with the regulation is "impossible." Madison Park argues that "how much a licens[ee] must do towards preventing the activity remains a complete mystery[.]" Madison Park asserts that BCC Art. 13, § 5–15 is "devoid of any explanation as to how the Commissioner is to apply the 'knew or should have known' clause" and it is unclear if a licensee is required to prevent only identified criminal behavior or all criminal activity once it is on notice of a particular crime.

The Commissioner counters, citing *Lussier v. Md. Racing Comm'n,* 100 Md.App. 190, 220, 640 A.2d 259 (1994), that "regulations concerning commercial activities, compared to criminal statutes, require less specificity" and notes that BCC Art. 13, § 5–15 "has already survived one attack for alleged vagueness." [8] The Commissioner avers that the regulation is not vague simply because it allows the Commissioner to exercise some discretion. The Commissioner asserts that the regulation allowed Madison Park to "pursue any lawful avenue" to prevent crime on its property, but that the facts show Madison Park failed to pursue any avenue "at all."

---

8. This argument refers to *McBriety v. Balt.,* 219 Md. 223, 227, 148 A.2d 408 (1959), a case which held that an earlier version of the statutory scheme for licensing multiple-family dwellings, ordinance number 1077, was valid. Because the case addresses an outdated version of the regulation, we only note that the Commissioner is correct that the general statutory licensing scheme has passed constitutional scrutiny for vagueness.

In rebuttal, Madison Park concedes that the regulation is not required to "enumerate *every* conceivable prohibited activity" but argues that BCC Art. 13, § 5–15 fails to "enumerate *any* prohibited activity." (Emphasis in original). Madison Park reiterates that, because compliance with the mandate to prevent all crime is impossible, the regulation cannot be enforced in any manner that is not arbitrary.

■ The "void for vagueness" doctrine applies to laws with both criminal and civil penalties. "However, where a statute imposes criminal penalties, the standard is certainly higher than the standard applicable to statutes imposing only civil penalties." *Neutron Prods., Inc. v. Dep't of the Env't,* 166 Md.App. 549, 609, 890 A.2d 858 (2006) (citations omitted). In *McFarlin v. State,* 409 Md. 391, 410, 975 A.2d 862 (2009), the Court of Appeals, quoting *Galloway v. State,* 365 Md. 599, 781 A.2d 851 (2001), explained that "a statute must be 'sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties,' otherwise, the enactment is void-for-vagueness." *See also Bowers v. State,* 283 Md. 115, 120, 389 A.2d 341 (1978). The *McFarlin* Court then summarized the void-for-vagueness analysis:

> A well grounded principle in federal constitutional law is that, when considering the void-for-vagueness doctrine, courts consistently consider two criteria or rationales. The first rationale is the fair notice principle that persons of ordinary intelligence and experience be afforded a reasonable opportunity to know what is prohibited, so that they may govern their behavior accordingly. The standard for determining whether a statute provides fair notice is whether persons of common intelligence must necessarily guess at the statute's meaning. A statute is not vague under the fair notice principle if the meaning of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves if they possess a common and generally accepted meaning.

The second criterion of the vagueness doctrine regards enforcement of the statute. This rationale exists to ensure that criminal statutes provide legally fixed standards and adequate guidelines for police, judicial officers, triers of fact and others whose obligation it is to enforce, apply and administer the penal laws. To survive analysis, a statute must eschew arbitrary enforcement in addition to being intelligible to the reasonable person.

*McFarlin,* 409 Md. at 410–11, 975 A.2d 862 (citation omitted); *see also Ashton v. Brown,* 339 Md. 70, 90, 660 A.2d 447 (1995) (citing *Bowers,* 283 Md. at 125, 389 A.2d 341).

We disagree with Madison Park that BCC Art. 13, § 5–15 contains language that is unclear. The regulation permits revocation of a license upon a finding that the owner has either "allowed" the property to be used for "prostitution, drug trafficking, or other criminal activity that creates or constitutes a nuisance" or "knew or should have known that the premises were being used for one of these purposes and failed to prevent them from being so used." The types of activities prohibited are clearly enumerated. The regulation then creates two avenues that permit revocation—if the owner allows the prohibited activities, which requires affirmative action by the owner, or if the owner fails to act to prevent such use of which it has actual or constructive knowledge. "Prevent" has a legal meaning: "to hinder or impede," BLACK'S LAW DICTIONARY 1226 (8th ed.2004), which is in accord with its common usage. Accordingly, we find that a reasonable person of average intelligence would understand what the regulation required.

▮▮▮ Regarding Madison Park's argument that the Commissioner's use of discretion renders the regulation unconstitutional, we note that the Court of Appeals has consistently held:

[A] statute is not unconstitutionally vague merely because it allows for the exercise of some discretion on the part of law enforcement and judicial officials. It is only where a statute is so broad as to be susceptible to irrational and selective

patterns of enforcement that it will be held unconstitutional under [the] second arm of the vagueness principle.

*Galloway,* 365 Md. at 616, 781 A.2d 851; (citing *Bowers,* 283 Md. at 122, 389 A.2d 341). Moreover, the general rule in Maryland is that unless the challenged statute "encroaches upon fundamental constitutional rights" such as free speech and assembly, then the "application of the void-for-vagueness doctrine is based on the application of the statute to the 'facts at hand.'" *Id.* (quoting *Bowers,* 283 Md. at 122, 389 A.2d 341). It is "immaterial that the statute is of questionable applicability in foreseeable marginal situations, if a contested provision clearly applies to the conduct of the defendant in a specific case." *Bowers,* 283 Md. at 122, 389 A.2d 341 (citation omitted).

As discussed in section IV, *infra,* the Commissioner examined the "facts at hand" and found that Madison Park failed to act to "prevent" drug trafficking and other crimes from occurring on its property. The regulation requires notice and an opportunity to be heard as to the facts in each case; which weighs against arbitrary enforcement. Therefore, we hold that BCC Art. 13, § 5–15 is not unconstitutionally vague.

### III. Due Process

 Madison Park argues that the Commissioner "prejudged the outcome of the hearing," as evidenced by the statements in the Notice of Hearing, that "sufficient evidence" existed to revoke the License. Madison Park contends that such pre-judgment, along with the hearing being "conducted by an employee of the Department who answers to the Commissioner," subjected it to bias and denied it due process.

The Commissioner responds that it is typical for administrative agencies to investigate and adjudicate their own regulatory enforcement actions. Regarding the Notice of Hearing, the Commissioner asserts that its purpose was to describe the basis for and set the hearing, with the hearing held to allow the Commissioner to "attempt to establish [the] evidence." In rebuttal, Madison Park maintains that the language in the

Notice of Hearing was tantamount to impermissible prejudgment of the case. We agree with the Commissioner.

In *Mont. Cnty. v. Stevens*, 337 Md. 471, 485, 654 A.2d 877 (1995), the Court of Appeals stated that it is "very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings" with no violation of due process resulting. We, likewise, find no violation of due process by the Commissioner simply because an employee of the Department was designated in his place to conduct the hearing.

Regarding prejudgment, the Commissioner cites *Am. Recovery Co., Inc. v. Dep't of Health & Mental Hygiene*, 306 Md. 12, 506 A.2d 1171 (1986). We agree that *Am. Recovery* is on point. In *Am. Recovery*, the Department of Health and Mental Hygiene ("DHMH") issued civil penalty assessments against American Recovery Company, Inc. ("ARC"), a company it licensed for the storage and disposal of hazardous wastes. After a hearing in which the proposed penalties were imposed, and in two instances, increased, ARC petitioned for judicial review in the circuit court. The circuit court affirmed but reduced the assessed penalties. On appeal, ARC argued that its guilt was prejudged prior to the hearing. The language in the original notification from DHMH stated that inspections had found "conditions constituting violations of [the applicable regulations]." *Id.* at 19–20, 506 A.2d 1171. The Court explained:

> This type of factual recitation did not diminish the obligation of DHMH to prove the existence of these facts at the administrative hearing. Indeed, the parties generated over 700 pages of transcript at the hearing in disputing the alleged violations. We agree with the trial court's conclusion that these documents basically constituted "charging document[s]."[ ] The language contained therein, although factual in tone, did not serve to adjudicate the subject matter of the documents. The mere fact that the charging document, entitled "Civil Penalty Assessment," may not be

artfully captioned, as the trial court pointed out, is not enough to sustain ARC's contention that the agency prejudged the case.

*Id.* at 20, 506 A.2d 1171.

We disagree with Madison Park that the Notice of Hearing, by stating: "There is sufficient evidence to establish ..." renders the case *sub judice* inapposite to *Am. Recovery.* Such a statement is not indicative of prejudgment particularly when a full hearing on the merits, where Madison Park had notice and the opportunity to both present evidence and rebut the Department's evidence, took place.

## IV. Substantial Evidence

"The proper approach for determining whether there is substantial evidence is if a reasoning mind could reasonably have come to the factual conclusion that the agency reached." *Md. Dep't of the Env't v. Ives,* 136 Md.App. 581, 585, 766 A.2d 657 (2001). The Court of Appeals recently explained:

> The reviewing court defers to the agency's factual findings, if supported by the record. The reviewing court, moreover, "must review the agency's decision in the light most favorable to it; ... the agency's decision is *prima facie* correct and presumed valid ... it is the agency's province to resolve conflicting evidence and to draw inferences from that evidence."

*Emps.' Ret. Sys. of Balt. v. Dorsey,* 430 Md. 100, 110, 59 A.3d 990 (2013) (quoting *Md. Aviation Admin. v. Noland,* 386 Md. 556, 571, 873 A.2d 1145 (2005)).

Madison Park argues that the evidence referred to crime in the general neighborhood, not specifically in the property, and that the Department "did not present substantial evidence that crime in MPNA is any worse than the surrounding neighborhood or other similarly situated housing complexes." Madison Park avers that the Department failed to present any evidence that Madison Park knew or should have known of

any "specific and identifiable criminal activity and failed to prevent it."

The Commissioner cites to the documentary evidence that was received without objection by Madison Park, in support of its argument that crime was constantly occurring on the property. The Commissioner stresses that Madison Park's arguments regarding the rest of the neighborhood are without merit because its license, and the revocation thereof, does not relate to the surrounding neighborhood.

Madison Park argues in rebuttal that the Department "did not present credible evidence demonstrating that the security measures taken by [Madison Park] were inadequate or unreasonable." Madison Park redirects our attention to several shooting instances that occurred outside the property in support of its contention that violent crime was not occurring within the property. Madison Park points to the Department's inclusion of the shootings as proof that substantial evidence was lacking and that the license revocation was arbitrary.

We disagree with Madison Park, and our review of the record reveals that there was substantial evidence to support the Commissioner's decision. Kaplan testified that the Strategic Plan Eradicating Drug Activity Madison Park North Apartments/Reservoir Hills ("Strategic Plan") was prepared in either 2004 or 2005 in response to the City's concerns about the rampant crime in MPNA. The only items in the plan that were completed were the removal of some shrubbery used to hide drug stashes and the installation of some lighting on the property. However, the record demonstrates that these efforts failed to control narcotics trafficking in MPNA, because individuals (including residents and guests) also used basements and mailboxes to stash drugs and continued to sell drugs through the fence, out of windows, and in front of buildings.

Kaplan testified that she received a letter in October 2008 from the Commissioner that put them "on notice to—we were not performing well, and he was upset." Kaplan testified that

after receiving the letter, the management company met with the Department and gave an updated plan. Kaplan testified that on March 16, 2009, her assistant submitted a "status report" letter to the Department. As to the items listed in the plan, Kaplan testified that security cameras had not been installed, gates and guard-controlled access to the property were not implemented, photo identification cards of all the residents was not completed, and that many capital improvements had been stopped because of efforts to sell the property.

The record reflects that Madison Park management and security personnel made minimal efforts to obtain police reports or contact police regarding crime at MPNA in 2008 and none after April of 2009. The record demonstrates that Madison Park disagreed with police recommendations regarding the fence surrounding the property, but did nothing to implement the measures they had proposed, including enclosing the fence with electronically-controlled gates. The record supports the Commissioner's conclusion that any efforts made by Madison Park occurred after the Notice of Hearing was issued.

Police reports in evidence also demonstrate that the Madison Park parking lots were used for drug trafficking. Police reports reveal that in 2010, despite the testimony of Lt. Kluver that drug trafficking had been eradicated from Madison Park, drugs were still being sold on the premises, both in open areas and out of residences. Police reports in December of 2009 continued to report that Madison Park was an "open air drug market where narcotics are readily bought, sold, and used." The record demonstrates that such activity was occurring as late as July 2010. As noted by the Commissioner, the Department's exhibits reflected "37 separate incidents spanning 20 months involving the manufacture, packaging, sale or storage of marijuana, cocaine and/or heroin on the property of Madison Park North Apartments. There were also 10 incidents involving violence, murder and/or dangerous weapons."

While Madison Park attempted to downplay the evidence, including stating that one police report did not reflect criminal activity on the premises because it was a "dead on arrival" where the individual died in their bed, a review of the record reveals that the same residence was involved in a narcotics arrest prior to the death, that the deceased individual was a known drug and alcohol abuser, and drugs were found in the apartment when the police responded to the call. The same apartment was searched in January 2010 after officers smelled burning marijuana coming from the door; four individuals were arrested and the seized evidence included narcotics, paraphernalia, and ammunition. The apartment was searched again in February 2010, when an observed drug dealer informed police that he sometimes lived there with a relative. A second report for "dead on arrival" involved another individual known to use illegal narcotics.

The record also demonstrates that residents were not only using illegal substances but were in possession of illegal firearms and engaged in other illegal activities, such as street gambling, and that security was aware of such activity.[9] Lt. Kluver testified that he was aware of raids and warrants executed on units in MPNA, and that he notified management. Many of the search and seizure warrants were executed using a key provided by management, and the record reflects that MPNA maintenance were aware of apartment raids that resulted in damage to doors and locks. Therefore, there was ample evidence, despite the lack of police reports provided to management directly, that Madison Park was aware its premises were being used for illegal activities.

Madison Park further admitted that it did not utilize any methods to conduct criminal background checks other than when residents first applied for tenancy, nor did it make any

---

9. Lt. Kluver testified that one shooting victim, Renata Broom, had been "banned from the property for various crimes he committed in the community and at the apartment complex." Broom's shooting occurred on the MPNA grounds in connection with a "dicing game, gambling table." Lt. Kluver testified that his men saw the players "set up again before they went off duty."

efforts to engage police. The record demonstrates that even if residents were evicted from a residence, they could, and did, continue to reside on the premises with relatives or other tenants. The record also demonstrates that numerous registered gun offenders, also known members of the "Black Guerrilla Family" and other Crips-associated gangs, resided at MPNA, contradicting the testimony of Lt. Kluver that gangs had been eradicated from MPNA in 2009. Madison Park offered no evidence to show it was even attempting to investigate who was living in MPNA.

Three residents of MPNA testified: Lenore Gary, Danyelle Jones, and Rosalyn Gilliam. Gary testified that drugs are both inside and outside of MPNA. Gilliam testified that "there is criminal activity everywhere," that "the police come and arrest people for nothing like they did my cousin," and that "the police is really the problem" because they "harass" members of her family. Jones testified that she had worked for Tricap Management, the company responsible for managing MPNA. Gilliam and Jones clearly were not objective witnesses, and we cannot say that the Commissioner erred in finding them to be less credible than the police experts. The testimony of Gilliam supports the reasonable inference that the presence of the police was unwelcome by many residents. It also suggests, along with police documents detailing how relatives were harboring criminals in their units, that some residents were not willing to work with Madison Park to eradicate crime.

Madison Park's argument that crime within MPNA was no worse than crime in the surrounding neighborhood is without merit. Madison Park had the responsibility to prevent crime within MPNA, not the surrounding neighborhood. The police testimony and documentary evidence support the finding that drug trafficking, one of the activities forming a basis for revocation, was occurring in MPNA. Any testimony regarding other places in Baltimore City where drug trafficking was also occurring is irrelevant. The documentary evidence negates the testimony of Madison Park's experts and supports the

Commissioner's finding that the testimony of Madison Park's witnesses was self-serving.

Madison Park argues that it was "impossible" to stop crime. However, as discussed, "prevent" has a broader meaning. It means to "hinder or impede," and the evidence supports the Commissioner's finding that Madison Park did not act to a significant degree to impede crime on its property, despite repeated assurances to the Department that it would implement measures proposed in its Strategic Plan and updates to that plan. While Madison Park prepared plans, it admitted failing to implement those plans, and now attempts to place the blame on the Department. The statute does not require the Department or the police to approve a plan just because it was presented by Madison Park or to otherwise direct Madison Park in its crime prevention efforts. The burden is on the property owner to satisfy the statute, and the evidence supports the Commissioner's finding that Madison Park did not do so.

Accordingly, we affirm the circuit court's decision denying the petition for a writ of mandamus.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**